**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**Roanoke Division**
**Civil Case Action No.**

| | |
|---|---|
| DENIECE PAGANS and JANET SWEET, individually and on behalf of all others similarly situated, | |
| Plaintiffs, | |
| v. | **CLASS ACTION**    7:21cv549 **COMPLAINT** |
| ADVANCE STORES COMPANY, INCORPORATED and THE RETIREMENT COMMITTEE OF ADVANCE AUTO PARTS, INC. 401(k) PLAN, | **JURY TRIAL DEMANDED** |
| Defendants. | |

# INTRODUCTION

1.      Federal law affords employers the privilege of enticing and retaining employees by setting up retirement and defined contribution plans pursuant to 26 U.S.C. § 401 ("401(k) plans"). These plans provide employees investment options with tax benefits that inure to the benefit of the employees and, necessarily, to the employers by increasing the "net" compensation their employees receive via tax deferment. To enjoy this benefit, employers must follow the rules and standards proscribed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et. seq*. ("ERISA").

2.      The Defendants chose to accept the benefits of federal and state tax deferrals for their employees via a 401(k) plan, and the owners and executives of Defendant organizations have benefitted financially for years from the same tax benefits. However, Defendants have not

followed ERISA's standard of care. This lawsuit is filed after careful consultation with experts and publicly available documents to return benefits taken from Plan participants by Defendants.

3.      Although ERISA has a reputation for being notoriously complicated, at its core, the issue is simple. Defendants did not act reasonably and consistently with ERISA's provisions, costing Plan participants and beneficiaries millions of dollars.  The breaches broadly can be characterized as (1) choosing expensive mutual funds when otherwise identical but cheaper funds were available, (2) paying covered service providers excessive compensation, and (3) failing to diversify.

4.      Defendant Advance Stores Company, Incorporated is a Virginia company with a principal place of business in Roanoke, Virginia.

5.      Advance Stores Company, Incorporated is the sponsor and fiduciary for the Advance Auto Parts, Inc. 401(k) Plan (hereinafter the "Plan").

6.      Plaintiffs Deniece Pagans and Janet Sweet bring this matter on behalf of themselves and as a representative of a class of similarly situated persons, on behalf of the Plan.

7.      Plaintiffs bring this action pursuant to 29 U.S.C. § 1132(a)(2) and (3), which provide that participants in an employee retirement plan may pursue a civil action on behalf of the Plan to remedy breaches of fiduciary duties and other prohibited conduct and to obtain appropriate equitable and monetary relief as set forth in 29 U.S.C. § 1109.

8.      This case presents a federal question and, therefore, this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132 (e)(1)(F).

9.      Venue is proper pursuant to 29 U.S.C § 1132(e)(2) and 28 U.S.C. § 1391(b) because this is the District where the Plan is administered, where breaches of fiduciary duties giving rise to the actions occurred, and where Defendants may be found.

10.    Although some ERISA claims for denial of benefits require claimants to exhaust administrative remedies, no such requirement applies to breaches of fiduciary duties. As such, this Court has jurisdiction of this case without plaintiffs having to show that they have exhausted administrative remedies.

11.    The Class Period is yet to be determined, and it will need to be ferreted in discovery. ERISA traditionally has a six-year statute of limitations, but in this case, the Defendants had and have an ongoing duty to rectify the deficiencies they made in the Plan / trust that creates a continuing duty and tolls the statute, so the Class Period will ultimately begin when the Defendants began committing the breaches described herein.

12.    According to page 21 of the Defendants' first electronic filing about the trust's investment and other financial statements (the 2009 Annual Return/Report of Employee Benefit Plan (obtained at www.efast.dol.gov)), auditors reported the trust's financial standing on July 21, 2010 in a letter directly to the "Retirement Committee of Advance Auto Parts, Inc. 401(k) Plan." Eleven years of these audit reports and other Schedules reported to the U.S. Departments of Treasury and Labor form the crux of the evidence of the Defendants' reckless, imprudent and disloyal actions that directly harmed the trust and participants/beneficiaries for over a decade.

13.    Each year's administrator is delineated herein. The administrator each year is a fiduciary for purposes of ERISA § 402(a)(1) and has broad power to manage the Plan:

> Filed late w/ extension 2009 Annual Return/Report of Employee Benefit Plan Signature of plan administrator: 10/14/2010 by RICH MOORE
> Filed on time, 2010 Annual Return/Report of Employee Benefit Plan Signature of plan administrator: 7/28/2011 C RICHARD MOORE III
> Filed late w/ extension 2011 Annual Return/Report of Employee Benefit Plan Signature of plan administrator: 8/20/2012 SARAH POWELL
> Filed late w/ extension 2012 Annual Return/Report of Employee Benefit Plan Signature of plan administrator and Signature of employer/plan sponsor: 8/07/2013 CHARLES RICHARD ROBBINS
> Filed late w/ extension 2013 Annual Return/Report of Employee Benefit Plan Signature of plan administrator and Signature of employer/plan sponsor: 8/06/2014 RICHARD ROBBINS
> Filed late w/ extension 2014 Annual Return/Report of Employee Benefit Plan Signature of plan administrator: 09/18/2015 RICHARD ROBBINS

3

Filed late w/ extension 2015 Annual Return/Report of Employee Benefit Plan Signature of plan administrator: 10/14/2016 RICHARD ROBBINS
Filed late w/ extension Amended 2016 Annual Return/Report of Employee Benefit Plan Signature of plan administrator: 10/16/2017 MELISSA LESLEY
2017 filed 2/11/2019 past extension date; Annual Return/Report of Employee Benefit Plan Signature of plan administrator: MELISSA LESLEY
Filed late w/ extension 2018 Annual Return/Report of Employee Benefit Plan Signature of plan administrator: 10/15/2019 ELIZABETH HOANE
Filed late w/ extension 2019 Annual Return/Report of Employee Benefit Plan Signature of plan administrator: 10/15/202

14.     The "Retirement Committee, Advance Auto Parts, Inc. 401(k)" is also an ERISA fiduciary in practice and delineated by Fidelity Basic Plan Document's description of "Named Fiduciary."

15.     The Retirement Committee of Advance Auto Parts, Inc. 401(k) Plan is also a named defendant, although plaintiffs have not named at this time the potential individual defendants on same committee.

16.     The Plan is a legal entity that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party. Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants. The Plaintiffs' allegations and facts are detailed in this pleading in order of the primary sections of the United States Code relating to the evidence of the Defendants' *flawed*, *reckless, imprudent* and *disloyal* actions (evaluated using the Defendants' own certified Annual Returns/Reports of Employee Benefit Plan filed with the U.S. Departments of Treasury and Labor for the plan year when their conduct occurred). The Plaintiffs' beliefs and assertions are derived *first* from the Defendants' Annual Returns/Reports of Employee Benefit Plan (Forms 5500) sent annually to the U.S. Departments of Treasury (IRS) and Labor (DOL) (all available copies obtained from the plan years 2009 to 2019 (www.efast.dol.gov). Second, information comes from the Defendants' chosen and retained funds' prospectuses (i.e., those funds

detailed in the Defendants' certified[1] governmental filings) and obtained for the years of the Defendants' conduct from the U.S. Securities and Exchange Commission (SEC) at their website (www.sec.gov/edgar). Third, they provide evidence of the Defendants' violations against the written terms of the Defendants' own Defined Contribution Plan and Trust Document (obtained from the U.S. Securities and Exchange Commission (SEC)). The Defendants used this document to initially request tax-exempt status for their trust from the IRS (allowance stated in the IRS Determination Letter was dependent on the Defendants' compliance with the terms of the plan documents).



---

Filed late w/ extension 2009 Annual Return/Report of Employee Benefit Plan Signature of plan administrator: 10/14/2010 by RICH MOORE

Filed on time, 2010 Annual Return/Report of Employee Benefit Plan Signature of plan administrator:  7/28/2011 C RICHARD MOORE III

Filed late w/ extension 2011 Annual Return/Report of Employee Benefit Plan Signature of plan administrator: 8/20/2012 SARAH POWELL

Filed late w/ extension 2012 Annual Return/Report of Employee Benefit Plan Signature of plan administrator and Signature of employer/plan sponsor: 8/07/2013 CHARLES RICHARD ROBBINS

Filed late w/ extension 2013 Annual Return/Report of Employee Benefit Plan Signature of plan administrator and Signature of employer/plan sponsor: 8/06/2014 RICHARD ROBBINS

Filed late w/ extension 2014 Annual Return/Report of Employee Benefit Plan Signature of plan administrator: 09/18/2015 RICHARD ROBBINS

Filed late w/ extension 2015 Annual Return/Report of Employee Benefit Plan Signature of plan administrator: 10/14/2016 RICHARD ROBBINS

Filed late w/ extension Amended 2016 Annual Return/Report of Employee Benefit Plan Signature of plan administrator:  10/16/2017 MELISSA LESLEY

2017 filed 2/11/2019 past extension date; Annual Return/Report of Employee Benefit Plan Signature of plan administrator:  MELISSA LESLEY

Filed late w/ extension 2018 Annual Return/Report of Employee Benefit Plan Signature of plan administrator: 10/15/2019 ELIZABETH HOANE

Filed late w/ extension 2019 Annual Return/Report of Employee Benefit Plan Signature of plan administrator: 10/15/2020

## I.     RULES AND CONCEPTS APPLICABLE TO 401(K) PLANS

17.     In a defined contribution plan, participants' benefits "are limited to the value of their own investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison* Int'l, 135 S. Ct. 1823, 1826 (2015).  Thus, the employer has no incentive to keep costs low or to closely monitor the Plan to ensure every investment remains prudent because all risks related to high fees and poorly-performing investments are borne by the trust and participants/beneficiaries.

18.     To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries.  29 U.S.C. § 1104(a)(1).  These twin fiduciary duties are "the highest known to the law." *Chao v. Hall Holding Co., Inc.,* 285 F.3d 415, 426 (6th Cir. 2002), *cert. denied*, 527 U.S. 1168 (2003).  Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), *See Dimensions, Inc. v. State Street Bank & Trust Co.,* 931 F. Supp. 2d 296, 305 (D. Mass. 2013) and *see*, 29 U.S.C. § 1104(a)(1)(B).

19.     The duty of loyalty requires fiduciaries to act with an "eye single" to the interests of plan participants.  *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000).  "Perhaps the most fundamental duty of a [fiduciary] is that he [or she] must display . . . complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons."  *Pegram*, 530 U.S. at 224 (quotation marks and citations omitted).  Thus, "in deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider only factors relating to the interests of plan participants and beneficiaries . . .  A decision to make

6

an investment may not be influenced by [other] factors unless the investment, when judged solely on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan." Dep't of Labor ERISA Adv. Op. 88-16A, 1988 WL 222716, at *3 (Dec. 19, 1988) (emphasis added).

20.     On behalf of the trust as well as the participants/beneficiaries in the Advance Auto Parts, Inc. 401(k) Plan, the Defendants must discharge their responsibility "with the care, skill, prudence, and diligence" that a "prudent" person "acting in a like capacity and familiar with such matters would use." 29 U.S.C. § 1104(a)(1)(B). Under this "prudent person" standard, courts must determine "whether the individual trustees, at the time they engaged in the challenged transactions, employed the appropriate methods to investigate the merits of the investment and to structure the investment." *Donovan v. Mazzola*, 716 F.2d 1226, 1232 (9th Cir. 1983). "Because the content of the duty of prudence turns on 'the circumstances ... prevailing' at the time the fiduciary acts, § 1104(a)(1)(B), the appropriate inquiry will necessarily be context specific." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014). "This duty of prudence extends to both the initial selection of an investment and the continuous monitoring of investments to remove imprudent ones." *Terraza v. Safeway Inc.,* 241 F. Supp. 3d 1057, 1069-70 (N.D. Cal. 2017); see *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015) ("[T]he duty of prudence involves a continuing duty to monitor investments and remove imprudent ones.").

21.     Also, by way of introduction, it should be noted that the Plan's assets are owned by the trust created for the Plan in an omnibus fashion. This status as a trust is explained on page 2, lines 9a and 9b, for every Form 5500 certified by the Defendants since 2009, as well as 29 U.S.C. § 1103. Moreover, the Fidelity Basic Plan Document says:

> "Establishment of Trust Fund. A trust is hereby established under the Plan. The Trustee shall open and maintain a trust account for the Plan and, as part thereof, Accounts for such

individuals as the Employer shall from time to time notify the Trustee are Participants in the Plan. The Trustee shall accept and hold in the Trust Fund such contributions on behalf of Participants as it may receive from time to time from the Employer. The Trust Fund shall be fully invested and reinvested in accordance with the applicable provisions of the Plan in Fund Shares or as otherwise provided in Section 20.10."

22.     Also by way of introduction, Plaintiffs of course do not know yet the exact processes the Defendants employed to choose its vendors and funds, as that information is solely in possession of Defendants.  However, the processes Defendants employed were necessarily flawed, as they resulted in demonstrably unnecessary costs to the participants that any competent process would have avoided.

23.     It would not matter if the Defendants' flawed processes were the result of innocent mistake, as, "a pure heart and an empty head are not enough."  *DeFelice v. U.S Airways, Inc.*, 497 F.3d 410, 418 (4th Cir. 2007) (quoting *Donovan v. Cunningham*, 716 F.2d 1455, 1467 (5th Cir. 1983)).

## DEFINITIONS

24.     There are two major categories of expenses within a defined contribution plan: investment management expenses and administrative expenses.

25.     **Investment management expenses** are asset-based fees that are charged by a mutual fund to compensate the investment manager and fund company for managing the fund's assets and are a common and equivalent component among all share classes within a fund's expense ratio.

26.     **Administrative expenses** are the expenses a plan incurs for administrative services such as recordkeeping, accounting, legal and trustee services. These fees can be paid out of the Plan's investments or directly by the Plan's participants or plan sponsor.

27.     **Expense ratio** is the annual operating expenses of a mutual fund reflected as a percentage of the fund's assets and includes any SEC Rule 12b-1 fees, and other forms of revenue sharing, etc, in addition to investment management fees. These fees are directly deducted from the mutual fund's returns. On average, 82% of overall fees within a plan are investment expenses as expressed

by the expense ratio, while administrative fees on average make up only an average of 18% of total fees.

28.     **12b-1 fees** are a component of the expense ratio charged to participants to pay providers such as brokers/advisors for the marketing and distribution of a fund and may be used to pay other plan service providers. This fee is unique to each share class and can range from 0.00% to 1.00%.

29.     **Sub-transfer agency (Sub-T/A) fees** are a payment to a third-party administrator (TPA) or recordkeeper who holds an omnibus account at the mutual fund company for maintaining records of a plan's individual participants. Like 12b-1 fees, this fee is unique and specific to each share class.

30.     **Omnibus account** refers to the account designated to hold the securities and assets of a Plan for the benefit of the participants.  Plan participants are trust beneficiaries, but the securities are registered to the trust and not individually or in the employee's name.  Securities are traded daily and values sent to the recordkeeper to update participants' accounts and websites.

31.     A **recordkeeper** maintains software to hold accounting records to match the omnibus trust assets. The recordkeeper performs "daily valuations" in their accounting software to reflect the allocations of earnings of the trust assets for which each worker is entitled. It is essentially the 401k plans' bookkeeper. The recordkeeper tracks who is in the plan, what they own, and what money is going in and out.  Per the Plan document, they are the sub-accountant holding a sub-account for each participant with an account balance.

32.     The recordkeeper acts as the heart and soul of the plan making sure that the money and information goes where it is supposed to go. The recordkeeper typically provides information and a website about the investments. However, the recordkeeper is not necessarily a fiduciary. Rather,

the fiduciary duties are typically relegated to the employer. In this case, the fiduciaries are the Defendants who are herein named.

33.   **Recordkeeping expenses** are typically the largest administrative expense, followed by custodial/trustee services. Records of participants are held so that aggregate trust actions at an omnibus level can be accounted for each business evening.

34.   A **custodian** is responsible for holding an omnibus account of the Plan's assets to facilitate the paying of plan providers from the investments and safekeeping assets.   It is analogous to a bank.  A custodian does not provide investment advice.

35.   Recordkeeping and custodial services are essentially fungible commodities that can be performed equally well by many different potential providers. Eric Droblyen, *Evaluating   401k Providers: Separating Commodity from Value-Added Services*, The Frugal Fiduciary Blog (Feb. 10, 2015). Fiduciaries should, therefore, select recordkeeping and custodial service providers based on which provider can provide these services at the lowest cost to the Plan.

36.   A Plan can periodically engage in a competitive bidding process by submitting a Request for Proposal (RFP) to multiple service providers. According to the Department of Labor ("DOL"), regular use of each of these tools is the best means of controlling plan costs. Dep't of Labor Employee Benefits Security Administration, *Understanding Retirement Plan Fees and Expenses*, at 11 (December 2011), http://www.dol.gov/ebsa/pdf/undrstndgrtrmnt.pdf; Chao, Philip, "Whack-a-Mole," Catch Me if You Can Fiduciary Considerations in Controlling and Accounting for Administrative Fees, Jan. 25. 2014, at 16, http://www.experientialwealth.com/Data/Files/Whack-A-Mole%20-%20Fiduciary%20Considerations%20in%20Plan%20Fees%202014%2001%2025%20Chao%20Co%20S.pdf.

37.    **Asset-based compensation** occurs when a broker, recordkeeper or custodian is paid as a percentage of plan assets. This pay is thus a percentage of assets, and the assets consist of 1) salary that employees have put into the Plan, 2) employer matching dollars to the trust, 3) interest and dividends the trust earns on securities, and 4) realized and unrealized capital gains on trust investments. This method of payment virtually guarantees pay increases to providers when employees save each pay period without regard to increases in labor required by or liability exposure to those providers receiving asset-based compensation.

38.    **Fixed dollar** or **per head compensation** occurs when a recordkeeper or custodian is paid a certain, set amount per participant without regard to 1) the amount each participant saved to the plan, 2) the amount the Plan and trust earns, and 3) the amount the employer deposited to the Plan and trust. It contrasts with asset-based compensation.

39.    Administrative expenses can be paid directly by employers, directly by the plan, or indirectly as a built-in component of the fees charged for the investment products offered in the plan in a practice known as "**revenue sharing**." *E.g.,* Ayres & Curtis, *Beyond Diversification: The Pervasive Problem of Excessive Fees and 'Dominated Funds' in 401(k) Plans*, Yale Law & Economics Research Paper # 492, at 1486.

40.    Fees paid directly to service providers out of the plan assets are referred to as "Direct Compensation"; monies received by service providers pursuant to a revenue-sharing scheme are referred to as "Indirect Compensation." 29 C.F.R. § 2550.408b-2(c)(viii)(B); IRS Form 5500, Schedule C.

41.    Fees or compensation to Plan service providers can become excessive when they are NOT based on 1) labor and material costs plus 2) a reasonable profit.

42.    Plans that allow providers/vendors to enjoy revenue sharing pay those providers asset-based compensation, not fixed dollar or per head pay.

43.    If providers are paid based on revenue sharing, over time as assets rise in value, services provided by the provider must increase commensurately or a violation of ERISA Section 408(b)(2) occurs creating an IRS and Labor Department prohibited transaction for every year of overpayment.

44.    Most, but not all, forms of direct and indirect compensation are certified and filed annually by the Defendants on the Plan's Annual Report or **Form 5500**—the form that must be filed for employee benefit plans under sections 104 and 4065 of ERISA—or in the audited financial statements of ERISA-compliant 401(k) plans.

45.    Fiduciaries should use a **competitive bidding process, such as a request for proposal,** to select a recordkeeper. And, fiduciaries must monitor recordkeeping costs and services at reasonable intervals, such as every year or two. The key is that the fiduciary examination reflects the current circumstances, e.g., changes in market pricing, the size of the plan as it grows, the number of covered participants, and technological efficiencies garnered by recordkeepers. Cost savings from technological efficiencies and innovation have allowed recordkeeping to decrease their participant fees by fifty percent since 2006.

46.    The plan sponsor must monitor the Plans' recordkeeping costs according to the duties of prudence, loyalty and the Plan documents. Courts hold that failure to execercise due care in selecting service providers constitute a breach of fiduciary duty. *Mahoney v J.J. Weiser & Co.*, 564 F.Supp.2d 248, 255-56 (S.D.N.Y. 2008), *aff'd*, 339 F.App'x 46 (2nd Cir. 2009) (citations omitted).

47.     The plan sponsor must regularly leverage the plan size and negotiate for lower costs.  An ERISA budget account is a commonly used way for plan sponsors to capture all revenue sharing payments when a plan's designed (here, the Defendants) makes the poor decision to allow revenue sharing. This account serves multiple functions: 1) plan sponsors can readily account for and monitor all revenue sharing payments, 2) ensures service providers negotiate for and receive only reasonable fees each year, and 3) excess payments can be credited back to participants.

48.     Under trust law, plan sponsors must "avoid unjustified costs" and choose investments with the lowest expense ratios, particularly when the two investments are the same.

49.     The general duties of loyalty and prudence imposed by 29 U.S.C. § 1104 are supplemented by 29 U.S.C. § 1106, which provides a detailed list of **prohibited transactions** that constitute *per se* violations of ERISA. 29 U.S.C. § 1106(a)(1), in pertinent part:

> (A)     A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—
>
> (i)      sale or exchange, or leasing, of any property between the plan and a party in interest; . . .
>
> (ii)     furnishing of goods, services, or facilities between the plan and a party in interest;
>
> (iii)    transfer to, or use by or for the benefit of a party in interest, of any assets of the plan . . . .

50.     29 U.S.C. § 1106(b) relates to transactions between the plan and a fiduciary of the plan, providing that:

> A fiduciary with respect to a plan shall not—

(A)    deal with the assets of the plan in his own interest or for his own account;

(B)    in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries; or

(C)    receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

51.    The broad asset classes in plans generally include fixed investments, bonds, stocks, and real estate.

52.    Money market funds, guaranteed investment contracts, and stable value funds are examples of **fixed investments**.

53.    **Bonds** are debt securities, which are generally categorized by the issuer/borrower (U.S. Government, foreign governments, municipalities, corporations), the duration of the debt (repayable anywhere between 1 month and 30 years), and the credit risk associated with the particular borrower.

54.    **Equity**, or **stock**, investments, are generally defined by three characteristics: (1) where they invest geographically (i.e., whether they invest in domestic or international companies, or both); (2) the size of company they invest in (generally categorized as small cap, mid cap, or large cap); and (3) their investment style, i.e., growth, value, or blend.

55.    **Target-date funds** assemble a broad portfolio of investments from different asset classes at a risk level that declines over time as the targeted retirement date approaches.

56.    **Mutual funds** are investment funds governed by the U.S. Securities & Exchange Commission ("SEC") under the Investment Company Act of 1940.

57.     **Passive funds**, popularly known as "index funds," seek to replicate the performance of a market index, such as the S&P 500, by purchasing a portfolio of securities matching the composition of the index itself. James Kwak, *Improving Retirement Savings Options for Employees*, 15 U. Pa. J. Bus. L. 483, 493 (2013).

58.     **Actively managed funds**, on the other hand, use portfolio managers to pick individual stocks or bonds within a particular asset or sub-asset class to try to beat the market through superior investment selection. *Id.* at 485–86. S&P Dow Jones Scorecard for 2018 writes, "Over the long-term investment horizon, such as 10 or 15 years, 80% or more of active managers across all categories underperformed their respective benchmarks."

59.     Actively managed funds are typically much more expensive than index funds but offer the potential to outperform the market (although this potential is typically not realized).

60.     Trust law imparts a higher burden on fiduciaries when selecting actively managed funds (whose average fees are about 1% per year) that utilize a portfolio manager to manage a median of 80 to 90 stocks in an effort to beat a particular index. The extra burden exists because fiduciaries are effectively betting with participant assets that a fund manager has the skill to outperform a significantly less expensive index. Since expected return of stocks and bonds is effectively 5% over time, this 1% charge equates to 20% of the participants' expected returns.

61.     **Index funds** are low-cost mutual funds that invest in a specified basket of underlying investments matching or tracking a specific broadly used market index such as the S&P 500. Index funds are also known as "passive" funds because there is no portfolio manager actively buying and selling securities in an attempt to opportunistically time the market. Passively managed index funds are referenced in The American Law Institute, 1992, Restatement of the Law Third, Trusts—

Prudent Investor Rule: "The greater the trustee's departure from one of the valid passive strategies, the greater is likely to be the burden of justification and also of continuous monitoring."

62.   By following the passive fund strategy, index funds produce returns that are very close to the market segment tracked by the index.

63.   Index funds, therefore, offer predictability, diversified exposure to a particular asset or sub-asset class, and low expenses.

64.   Because the Defendants primarily chose high cost actively managed funds, their burden is extremely high. The median, average and dollar-weighted average expense ratio of the funds in the Plan exceed 1% annually in all periods between 2009 and 2018.

65.   **Loaded funds** refer to funds that charge SEC rule 12b-1 fees of over 0.25% per year.

66.   **No-load funds** refer to funds that may contain a minimal SEC rule 12b-1 fee (no more than 0.25%), and no front or back-end loads.

67.   **Share classes** are separate product units of a mutual fund portfolio created for different distribution methods and service levels. Each share class within a mutual fund portfolio is *identical* in every respect EXCEPT for the net returns and the distribution and service costs, such as SEC rule 12b-1 fees and shareholder service fees. Because these costs are reflected in the net returns, the performance of each share class will be higher or lower solely based on these expenses: the higher the expenses, the lower the returns. Broadly speaking, share classes are broken into institutional and retail categories.

68.   An **institutional share class** is a "no-load" class of shares that is available to large investors. Typical institutional shares have higher minimum investment requirements but lower fees than their retail counterparts that are available to the general public where minimum required purchases range from $0 to $2,500.

69.     Institutional share classes are commonly known to have symbols such as "I" or "R6" at the end of their names. Reflected in Morningstar®: "You may be surprised to learn that many times, the institutional share class is the most widely held share class of a particular fund strategy. And, according to the Investment Company Institute, the "vast majority" of assets in institutional shares classes are held by retail investors." Regarding minimum required purchase amounts, these are typically waived on request. Morningstar® states: "Sometimes an advisor will bundle clients' accounts into a larger "omnibus account" to meet the higher minimum investment on lower-cost shares…"2

70.     A **retail share class** is a class of shares intended for individual investors with lower amounts to invest and higher service needs. They have higher fees compared to otherwise identical institutional funds

71.     Retail share classes commonly have front- or back-end loads and SEC rule 12b-1 and/or shareholder service fees of 0.25% or more.

72.     Retail share classes are commonly known to have symbols such as "A", "Adv" or "R1" through "R4" at the end of their names.

## II     DISCUSSION OF BREACHES

### A.  THE PLAN HAD EXCESSIVE COST IN MANY WAYS

#### 1. Introduction to cost issues

73.     Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must carefully consider the cost of investment options. "Wasting beneficiaries' money is imprudent. In devising and implementing

---

2 https://www.morningstar.com/articles/823640/how-to-access-funds-with-high-minimum-investments

strategies for the investment and management of trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act (the "UPIA"), § 7.

74.     Additional fees of only 0.18% or 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees … lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble*, 843 F.3d at 1198.

75.     As a simple example, if a beneficiary invested $10,000, the investment grew at a rate of 7% a year for 40 years, and the fund charged 1% in fees each year, at the end of the 40-year period the beneficiary's investment would be worth $100,175. If the fees were raised to 1.18%, or 1.4%, the value of the investment at the end of the 40-year period would decrease to $93,142 and $85,198, respectively.

76.     As will be explained in more detail, the Defendants were influenced by the ability to use investments offered by fund families that excessively depleted the trust and the Plaintiffs' daily net asset values (NAV). At the end of the month, the mutual fund family or SEC registered RIC (registered investment company) would pay or send these collected dollars to an intermediary (and thus the intermediary never sends a bill to the Defendants.

77.     The Defendants thereby benefited because the intermediaries used these dollars and billed the Defendants very little if any for periodic plan service costs because the Plan's participants were paying so many costs. This also allowed every future dollar deposited into the Plan to trigger the same deductions because the Defendants directed all fund reinvestments and future purchases from every element of funding to pay these same "kickbacks" to the intermediaries. For example, based on the Defendants' 2016 Form 5500 Income Statement (page 20) sent to the U.S. Departments of Treasury and Labor, the Defendants chose and kept expensive share classes so that the trust's

deposits (totaling $83,560,006) below were invested throughout the 2016 plan year into share classes that contained SEC Rule 12b-1 and/or "sub-transfer agency" fees:

    A.  $13,214,756--Employer line 2a(1)(A)

    B.  $36,986,571--Participants line 2a(1)(B)

    C.  $2,501,982--Rollovers line 2a(1)(C)

    D.  $12,076,937--Dividends registered investment company shares line 2b(2)(C)

    E.  $18,779,760--Net investment gain registered investment companies (e.g., mutual funds) line 2b(10)

78.    Reviewing the Defendants' first electronic Forms 5500 filing for the 2009 Plan year, they largely selected and retained for the trust and participants/beneficiaries share classes of funds with embedded additional expenses over those share classes that were cheaper and consistently higher performing (these embedded participant fees taken daily from the asset values of the mutual funds reduced/eliminated quarterly covered service providers' (CSP) invoices to the Defendants). The Defendants' actions meant that the costly investments were "seeded" each year with another $83.5M new dollars or a total of $918.7M (almost $1 billion from 2009 to 2019). These deposits dwarfed the Defendants' employer matching dollars total of $140,290,514. The Defendants' plan contributions comprised about fifteen percent (15%) of the total net additions from 2009 to 2019, meaning 85% of the dollars flowing into expensive share classes came from the participants/beneficiaries' savings and related dollars. The SEC Rule 12b-1 and/or "sub-transfer agency" *compensation* payments to covered service providers (CSP) triggered by the Defendants' actions (to use these costly share classes) increases as workers' savings are deposited twenty-six times each year and then held in an escrow for biweekly disbursements to the CSP. This chart,

Exhibit 1, below shows the Plan's additions to income from 2009 to 2019.  It is derived from the Defendants' Forms 5500 Schedule H, Part II Income and Expense Statements, line 2d:

| Line 2d | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | Total Income |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Income | $55,887,597 | $49,431,199 | $32,575,741 | $56,154,092 | $85,657,361 | $61,349,947 | $58,919,775 | $95,714,624 | $161,111,971 | $22,303,764 | $239,598,565 | $918,704,636 |

Exhibit 1

79.    For example, rounding the $85M/year to $100M means SEC Rule 12b-1 and/or "sub-transfer agency" payments from challenged funds of $450,000 ($100M * 0.45%) would be taken from the participants/beneficiaries' earnings daily and sent to the Defendants' chosen covered service providers (CSP) *annually*. This forty-five basis points is an *annual* prospectus SEC Rule 12b-1 and/or "sub-transfer agency" fee so the next year's $100M deposit would be added to the earlier year's deposit of $100M doubles the next payment or "kickback" or SEC Rule 12b-1 and/or "sub-transfer agency" fee to $900K (or $450,000 times 2). This is an underlying flaw with the Defendants' (1) fund selection and retention coupled with (2) the Defendants' compensation arrangement to covered service providers (CSP). Under ERISA, additional pay with no additional services creates an IRS and DOL prohibited transaction of 100% ("tier 2") and 20% respectively. Provider pay, direct or indirect, is ONLY permitted if the provider's services are "necessary for operation of the plan" and their pay is "reasonable."

The Complaint will now go through the specific excessive cost issues in detail.

### 2. The Defendants picked funds that had identical, related funds with cheaper costs that they could have purchased for the Plan

80.    Plaintiffs' assertions are NOT about a simple failure of the Defendants to offer the cheapest investment option nor about their failure to "scour the market" to find and offer the cheapest possible fund. The prospectuses list each funds' share class on the same page, in the same section—in fact, each share class is compared against its "sister" fund via expense and historical returns tables. The Defendants and responsible plan fiduciaries (RPF) could easily see the fund they should

have chosen are identical with the sole exception that some share classes cost more and the past returns (and thus future returns) are perfectly "negatively" correlated to these cost differences of the otherwise identical investments. The prospectuses show that each share class has identical "Management Companies," the same "Management Company IDs," identical stocks/bonds ("Holdings"), and identical "Portfolio managers." The funds Defendants could have, but did not choose, had the same prospectus benchmarks as the more expensive funds they chose, the same liquidity abilities, and the same net asset value (NAV) pricing derivations / settlements occurring daily. The only difference is that Defendants picked more expensive funds.

81. The Plan, formed in 1976, has nearly $1 billion dollars in assets that are entrusted to the care of the Plan and Trust's responsible plan fiduciaries (RPF). The Plan's assets under management qualifies it as a large plan in the defined contribution plan marketplace, and it is among the largest plans in the United States. As a large plan, the Plan had substantial bargaining power regarding the fees and expenses that were charged against participants' investments. To make matters worse, Defendants failed to utilize the lowest cost share class for most of the mutual funds within the Plan, and failed to consider cheaper alternatives to the mutual funds in the Plan. Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duties of prudence and loyalty, in violation of 29 U.S.C. § 1104. Their actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

82. There are several examples of this conduct by Defendants, picking more expensive funds when identical but cheaper ones are available.

83. Initially, by way of background, yields are paid monthly for mutual funds. They can constitute half or more of the funds' total return so reducing this monthly check to

participants/beneficiaries is especially imprudent. As recently as 2019 when the Plan was being recordkept by Fidelity, the Defendants moved the Plan's assets in the Vanguard Extended Market Index Adm fund ($11,685,639) yielding 1.07%/yr and gave it to Fidelity to invest in their own *proprietary* version yielding 0.92%/yr. These funds are nearly identical except for cost.

84.   Defendants repeated this behavior by (1) transferring $8,433,037 from the participants/beneficiaries' Vanguard Total Intl Stock Index to the Fidelity Total International Index and (2) moving $25,804,765 of the trust's money in Vanguard Total Bond Market Index (yield 2.23%) to Fidelity's proprietary U.S. Bond Index fund (yield 2%).   Again, those funds are nearly identical except for cost. These moves were necessarily bad for participants.

85.   In both the examples in the preceding two paragraphs there was no good basis for choosing funds that perform the same, by definition, as comparable funds, except that the funds the Defendants chose were more expensive.

86.   Interestingly, in another move, the Defendants moved $381,420,411 in 2019 from lower yielding "S" class of the BlackRock LifePath Index funds to the "O" class. That is a good move, but the "O" class was available to the Plan in 2011.   There is no evidence from the publicly available documents that the Defendants restored the trust to the position it should have been in, meaning restoration of the cost difference between "S" and "O" from 2011 to 2019, after their flawed processed finally caught this obvious error.

87.   A very simple example of a critical bond fund retained by the Defendants in 2009's Form 5500 is the PIMCO Total Return A, which will be the subject of the next several paragraphs.

88.   $16,333,072 of the Plan's / trust's money was invested in PIMCO A in 2009. The Plan held this expensive "A" share class all the way through the Defendants' 2019 Form 5500 filing to the IRS/DOL. However, there was an identical but cheaper share class (located adjacent to the "A"

share class in the 2009 fund prospectus labeled with "Instl" ("PIMCO Total Return Instl").)  The

2009 table below (Exhibit 2) is derived from the prospectus information but contains bolded/italics

to allow the reader to infer critical aspects easily. The "A" share class of the identical Management

Company's PIMCO Total Return mutual fund is much smaller in assets and has a more recent

"Inception Date". The Defendants could have increased annual income or "Yield 12-Month" for

the participants by forty-three basis points (0.43% or 9% increase in income) if the Defendants

had offered the Instl class.

| Yield 12-Month | Turnover Rate | Number of Holdings | Top-10 Holdings Percent | Assets ($millions) | Inception Date | 12-Month Return | 12b-1 Fees | Expense Ratio | True No-Load | As of 12/31/2009 |
|---|---|---|---|---|---|---|---|---|---|---|
| 5.01 | 300 | 18271 | 42.14 | 23,822.70 | 1/13/1997 | 13.33 | 0.25 | 0.90 | N | PIMCO Total Return A |
| *5.44* | 300 | 18271 | 42.14 | *115,919.40* | *5/11/1987* | 13.83 | | *0.46* | *Y* | PIMCO Total Return Instl |

Exhibit 2

89.     Exhibit 2 above conveys that the Defendants' retention at the time of their 2009 monitoring

period (based on their certified 2009 Form 5500) had only a 5.01% yield versus 5.44% for the

"Instl" (i.e., institutional).  Yet the Defendants retained the "A" class, which is identical to the

"Instl" version except the "A" class has 12b-1 fees, a higher expense ratio and is not true no-load.

Because this "Instl" version advertised that it waives its minimum purchase for trusts that

hold/trade mutual funds in an omnibus fashion (like the Defendants' plan and trust) large

institutions held about $116B in assets in this version over the Defendants' "A" class with only

about $24B at the end of 2009.  Exhibit 3 below adds further context.

| Name | True No-Load | Manager Tenure (Years) | Number of Holdings | Expense Ratio |
|---|---|---|---|---|
| PIMCO Total Return A | N | 26.91 | 20,319 | 0.850 |
| PIMCO Total Return Instl | Y | 26.91 | 20,319 | 0.460 |

| Name | 2011 | 2010 | 2009 | 2008 | 2007 | 2006 | 2005 | 2004 | 2003 | 2002 | 2001 | 2000 | 1999 | 1998 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PIMCO Total Return A | 3.74 | 8.36 | 13.33 | 4.32 | 8.57 | 3.51 | 2.41 | 4.65 | 5.07 | 9.69 | 8.99 | 11.56 | -0.75 | 9.24 |
| PIMCO Total Return Instl | 4.16 | 8.83 | 13.83 | 4.82 | 9.07 | 3.99 | 2.89 | 5.14 | 5.56 | 10.20 | 9.50 | 12.09 | -0.28 | 9.76 |

Exhibit 3

90.     Quantitatively, the "A" version (top row) above had a prior twelve month return at 13.33% (versus the True No-load "Instl" version at 13.83% (difference even greater than the SEC Rule 12b-1 credit at twenty-five basis points)).

91.     A portion of the Defendants' 2015 Form 5500, page 41 of 59, is below in Exhibit 4.  It shows that the participants invested $25,266,009 in PIMCO as of 12/31/2015. The Defendants originally selected this fund before 1/1/2009. Because the Defendants did not file earlier years of the Annual Return/Report of Employee Benefit Plan electronically, Plaintiffs have no way of knowing when the fund was originally selected, but it was before 2009.

| PIMCO Total Return Fund Class A | 25,266,009 |
|---|---|

*Excerpt above from page 41 of Defendants' 2015 Form 5500*

Exhibit 4

92.     Importantly, the Defendants never informed the participants/beneficiaries that a cheaper, identical share class was available for them to direct their salary savings into over many decades potentially.3 This lack of information applies to every trust asset the Defendants added and kept.

---

3 A trustee's duty "includes the responsibility to inform the beneficiaries fully of all facts which would aid them in protecting their interests." *Allard v. Pac. Nat'l Bank*, 99 Wash.2d 394, 404, 663 P.2d 104 (1983) (citing *Esmieu*, 88 Wash.2d at 498, 563 P.2d 203). "That the settlor has created a trust and thus required the beneficiaries to enjoy their property interests indirectly does not imply the beneficiaries are to be kept in ignorance of the trust, the nature of the trust property, and the details of its administration." *Allard*, 99 Wash.2d at 404, 663 P.2d 104. A trustee's duty includes the responsibility to inform the beneficiaries periodically of the status of the trust, its property, and how the property is being managed. *Allard*, 99 Wash.2d at 404, 663 P.2d 104. "If the beneficiaries are able to hold the trustee to proper standards of care and honesty and procure the benefits to which they are entitled, they must know of what the trust property consists and how it is being managed." *Allard*, 99 Wash.2d at 404, 663 P.2d 104. *Allard* holds that a trustee has a duty to inform beneficiaries about management of the trust that significantly affects their interest or, put differently, that a trustee breaches its duty to inform when it withholds information that would prejudice the beneficiaries. *Allard*, 99 Wash.2d at 404-05, 663 P.2d 104.

93.     The Defendants could have called the toll-free number depicted below in Exhibit 5 anytime and "switched" the participants/beneficiaries' share classes over a weekend. The economic damage to the trust and participants/beneficiaries due to lost opportunity for extra yield/return compounding cost over one percent each year or about twenty percent (20%) of the fund's expected rate of return (5%/yr). This means each year the Defendants' failure to act *for only this one fund* harmed the Plan and Trust and participants/beneficiaries investing in this fund by over $200,000 every year since the Defendants initially selected this fund.

| Per page 33, Defendants' 2009 Form 5500 as of 12/31/2009 at www.efast.dol.gov | Symbol | Share Class | Telephone Switch | Toll-Free Number | Initial Purchase |
| --- | --- | --- | --- | --- | --- |
| PIMCO Total Return A (Defendants') | PTTAX | A | Y | 800 426-0107 | 1000 |
| PIMCO Total Return Instl (Identical version) | PTTRX | Instl | Y | 800 927-4648 | 5000000 |

Exhibit 5

94.     The Exhibits above depict the prospectus information the Defendants should have read and noted documenting that their repeated retention of the PIMCO Total Return A *(in the participants/beneficiaries' limited menu of available investments in the Advance Auto Parts, Inc. 401(k) Plan)* earning only 36.56% over the prior five years *(less than the identical with less prospectus expenses)* PIMCO Total Return *Instl version earning 39.41%).* A difference of 2.85% is mathematically equivalent to 0.57% per year (2.85/5).

95.     From 2009 to 2019, the Defendants' "A" class with twenty-five basis points annually cost participants/beneficiaries investments averaging $226,170,188 in this fund (based on the Defendants' Forms 5500). So, the 25 basis points cost them directly (or daily) a total loss of $565,425.47. The lost opportunity cost because of compounding by not having the "Instl" identical version to buy cost Plan participants $1,899,829.58 or eighty-four basis points per year during the period.

96.     This lost compounding grows so that if the Plan first had this "A" PIMCO version 20 years

ago, participants growth would equal (as of 3/31/2021) 165.33% while the identical "Instl" version

grew at 188.47% (23.15% difference or 1.157% per year). Hence, the cost to restore the trust for

the Defendants' use of this share class over two decades would equal $5,233,578.15 (*based on*

*average fund sizes in the Defendants' 2009 to 2019 Annual Return/Report of Employee Benefit*

*Plan sent to the U.S. Departments of Treasury and Labor*).

97.     This excessive cost associated with the "A" fund explains why as of March 31, 2021, the

Defendants' share class had only $8B investments while the "Instl" version had $52B (over 650%

more).  Any entity paying attention to its investments with an eye toward minimizing expenses,

and with the type of purchasing power the Plan had, would opt into Instl, not A.

| | Name | Assets ($millions) |
|---|---|---|
| 1 ▶ | PIMCO Total Return A | 7,984.5 |
| 2 ▶ | PIMCO Total Return Instl | 51,934.8 |

Exhibit 6

98.     Exhibit 7 below shows the difference of column BJ (5-Year Total Return) for the

Defendants' choice of PIMCO Total Return A, PTTAX, is 2.85% less—0.57%/year compared to

Instl. So, to buy that "A" class and have the participants/beneficiaries pay higher daily expenses

to receive a fund credit at the end of the month of twenty-five basis points is an illogical burden

placed on them by the Defendants. Due to annual compounding it increases to an annual lost

opportunity cost of 1.135% annually over 15 years.  Participants/beneficiaries who invested

$10,000 in 2006, 15 years ago, would experience a future value of $24,428.55 in the better share

class.  By contrast, the investment in the class the Defendants chose would be $20,789.28 ($3,639.27 less).

| P | Q | BJ | BL | BN | |
|---|---|---|---|---|---|
| Name | Symbol | 5-Year Total | 10-Year Total | 15-Year Total | |
| PIMCO Total Return A | PTTAX | 36.56 | 69.68 | 143.07 | |
| PIMCO Total Return Instl | PTTRX | 39.41 | 77.23 | 160.1 | |
| | | 2.85 | 7.55 | 17.03 | |
| | | 0.57 | 0.755 | 1.135333333 | |

Exhibit 7

99.    Data in Exhibits 8 and 9 below (derived from archived prospectus data in www.sec.gov/edgar) empirically proves the Plaintiffs' assertions that the two mutual funds are *identical with the exception of the expense ratio*. The fee of twenty-five basis points is taken daily (1/365[th]) so receiving less interest, dividends and capital gains daily simply means the opportunity for growth, which is more important than savings deposits, is depleted repeatedly every day of every week of every month of every year. The Defendants could have noted in the U.S. Securities and Exchange Commission (SEC) prospectus that they could have switched anytime to the "True No-Load" version (at a cost of 0.46% instead of the 0.85%) by making a phone call to Toll-Free Number 888 877-4626.

100.    Exhibit 8 is below.  Note the columns from the SEC-prospectus data is identical.

| Defendants' (D) or Identical (I) | Name--March 31 2014 | Symbol | Expense Ratio | 12b-1 Fees | True No-Load | Inception Date | Fund Family | Web Site Address |
|---|---|---|---|---|---|---|---|---|
| *(D)* | *PIMCO Total Return A* | *PTTAX* | *0.85* | *0.25* | *N* | *1/13/1997* | *PIMCO* | *www.pimco.com/investments* |
| (I) "Oldest" | PIMCO Total Return Instl | PTTRX | 0.46 | | Y | 5/11/1987 | PIMCO | www.pimco.com/investments |

Exhibit 8

101.    Exhibit 9 is below.  Note the columns from the SEC-prospectus data is identical. Both funds are open-end mutual funds and are required to settle at 4pm every day—therefore, there is

NO difference in "liquidity" for the trust as holder of record of the mutual funds—sells and buys occur for all share classes at the same moment the fund family reconciles their funds' assets daily—that is why 401k plans are commonly called "daily valued plans."

| Defendants' (D) or Identical (I) | Name--March 31 2014 | Management Company | Management Company ID | Manager | Manager Start Date | Manager Tenure (Years) | Portfolio Date | Top-10 Holdings % | # of Holdings |
|---|---|---|---|---|---|---|---|---|---|
| *(D)* | *PIMCO Total Return A* | *Pacific Investment Management Co LLC* | *0C00001SUA* | *Gross* | *5/11/1987* | *26.91* | *12/31/2013* | *136.86* | *20319* |
| (I) | PIMCO Total Return Instl | Pacific Investment Management Co LLC | 0C00001SUA | Gross | 5/11/1987 | 26.91 | *12/31/2013* | 136.86 | 20319 |

Exhibit 9

102.    Another breach is found on the Defendants' 2015 Form 5500 (page 11) that the Defendants' selection of the "COL LARGE CAP IDX <u>A</u> - COLUMBIA MGT" (paying Fidelity thirty-five basis points, emphasis added) was identical to another share class costing less than half of the cost of this share class.

103.    The Defendants' "A" share class in 2014 yielded 1.42% over 12 months while the "Z" class of the identical mutual fund yielded 1.63%. It makes no sense to choose and retain a lesser yield of the same but cheaper fund could be had with a phone call to Columbia at 800.345.6611.

| Years Since Inception | Name | Yield 12-Month | Telephone Switch | Toll-Free Number |
|---|---|---|---|---|
| 20.29 | Columbia Large Cap Index Z | 1.63 | Y | 800 345-6611 |
| 18.47 | Columbia Large Cap Index A | 1.42 | Y | 800 345-6611 |

Exhibit 10

104.    Prospectus data for 2014 proves the investments are identical below. Character (D) in the leftmost column marks the row that represents the share class used by the Defendants and (I) marks the identical, lower cost "True-No-Load" version:

| (D) or (I) | Name 2014 | Symbol | Expense Ratio | True No-Load | Inception Date | Management Company | Management Company ID | Manager Name | Manager Start Date | Manager Tenure (Years) | Portfolio Date | Number of Holdings |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| (D) | Columbia Large Cap Index A | NEIAX | 0.45 | N | 10/10/1995 | Columbia Management Investment Advisers, LLC | 0C00001R1I | Alley, III, Shteyn | 7/24/2009 | 4.69 | 2/28/2014 | 503 |
| (I) | Columbia Large Cap Index Z | NINDX | 0.2 | Y | 12/15/1993 | Columbia Management Investment Advisers, LLC | 0C00001R1I | Alley, III, Shteyn | 7/24/2009 | 4.69 | 2/28/2014 | 503 |

Exhibit 11

105.     The next fund to analyze is Diamond Hill.  Diamond Hill is a Fidelity family fund, meaning that the recordkeeper had a proprietary interest in the fund and an inherent conflict.

106.     Diamond Hill Large Cap A was in the Plan.  It featured revenue sharing of fifty basis points. It paid 43% more to Fidelity than Diamond Hill Large Cap I and 76% more than Diamond Hill Large Cap Y, both available to the Plan.  Note that in column A (D) means the Defendants' choice and (I) means identical fund, except for cost.

| A | B | C | D | E | F | G | H | I | J | K | L | M |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| (D) or (I) | Name 2014 | Symbol | Expense Ratio | True No-Load | Inception Date | Management Company | Management Company ID | Manager Name | Manager Start Date | Manager Tenure (Years) | Portfolio Date | Number of Holdings |
| (D) | Diamond Hill Large Cap A | DHLAX | 1.05 | N | 6/29/2001 | Diamond Hill Capital Management Inc | 0C000033ZJ | Bath, Welch, Snowdon | 10/31/2002 | 11.42 | 2/28/2014 | 50 |
| (I) | Diamond Hill Large Cap I | DHLRX | 0.8 | Y | 1/31/2005 | Diamond Hill Capital Management Inc | 0C000033ZJ | Bath, Welch, Snowdon | 10/31/2002 | 11.42 | 2/28/2014 | 50 |
| (I) | Diamond Hill Large Cap Y | DHLYX | 0.65 | Y | 12/30/2011 | Diamond Hill Capital Management Inc | 0C000033ZJ | Bath, Welch, Snowdon | 10/31/2002 | 11.42 | 2/28/2014 | 50 |

Exhibit 12

107.     Additionally, Defendants added Diamond Hill A in 2010, replacing a DWS Strategic Value Inst. Fund.  The DWS fund that was replaced only cost 72 basis points and held twice the number

of stocks as Diamond Hill A, which was at 118 basis points.  Thus, DWS was a cheaper and less risky fund.

| | Institutional Only | Share Class | Telephone Switch | Toll-Free Number | Initial Purchase | Net-Asset Value | Expense Ratio | Annualized Std.Deviation 1-year | Number of Holdings | Name |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | A | Y | 888 226-5595 | 2,500 | 21.84 | 1.050 | 10.23 | 50 | Diamond Hill Large Cap A |
| 2 | Y | Inst | Y | 888 226-5595 | 2,500 | 21.95 | 0.800 | 10.23 | 50 | Diamond Hill Large Cap I |
| 3 | Y | Inst | Y | 888 226-5595 | 500,000 | 21.97 | 0.650 | 10.26 | 50 | Diamond Hill Large Cap Y |
| 4 | Y | Inst | Y | 800 728-3337 | 1,000,000 | 43.76 | 0.830 | 9.94 | 107 | DWS Equity Dividend Instl |

Exhibit 13

108.    The impact of the loss of compounding when revenue sharing classes' NAVs are priced each business day (accrued for weekends) is illustrated below. The total percentage growth of the Defendants' "A" version lagged by three hundred seventy-five basis points (3.75%) behind the identical "I" version. This equates empirically to a seventy-five basis point annual lag.

| (D) or (I) | Prospectus data, March 31 2014 | 5-Year Total % |
|---|---|---|
| **(D)** | **Diamond Hill Large Cap A** | 157.34 |
| (I) | Diamond Hill Large Cap I | 161.09 |
| | Difference: | 3.75 |

Exhibit 14

109.    The Defendants' initial Form 5500 for 2016 depicts that over seventy percent (70%) of the trust's dollars rested in investments for which a cheaper but absolutely identical investment existed (i.e., $331,124,308 out of $461,619,527). That means that seventy percent of the trust's net additions in 2014 and 2015 of $61,398,987 and $58,919,505 or a total of $120,313,492 trigger compensation to covered service providers (CSP) and had daily expense deductions that harmed the participants/beneficiaries and the trust. Not counting the principal, just these two years additions at twenty-five basis points means $300,783.73 dollars in increased pay to covered service providers (CSP) chosen by the Defendants and due to their services agreements' designed compensation methods.

**3.** **The Defendants allowed CSPs, especially the recordkeeper, to be paid excessive compensation**

110.    This section will analyze how and why various covered service providers (CSP) were paid excessively.

111.    According to Deloitte's 2019 Defined Contribution Benchmarking Survey Report: discussing recordkeeping fees, "The average per-participant direct fee reported was $54, up from $50 in 2017, with the consistent trend of *not* utilizing investment revenue to pay fees."   There is no reason the Defendants could not keep fees consistent with the trends and abilities of other plans, but it did not.

112.    To begin, it is unreasonable that Defendants had multiple CSPs receiving compensation directly from the trust, including Gleaves & Swearingen, McLeod Company, and Portfolio Evaluations, Inc.

113.    The compensation to Portfolio Evaluations, Inc. is initially problematic.   That outfit was paid $62,846 by the Plan according to the 2011 Form 5500.   Then, it was paid a flat $50,000 in 2012.   Portfolio Evaluations, Inc. was not a fiduciary for the Plan, it appears, and there is no conceivable way it added material value to the Plan.   There is little or no value added to the plan by repeated payments to a third-party not responsible for the Plan to evaluate the Plan.

114.    Related, CSPs servicing a *mature plan* such as the Plan (around almost five decades) see fairly typical labor commitments year over year to operate a plan. However, even as the number of participants in the Plan slightly fell, the CSPs made more money.   Based on the Defendants' own statements to the DOL and IRS, note how the participants with account balances (page 2 of each of the Defendants' Forms 5500 line 6g) have trended since 2015:



Exhibit 15

115.    Yet, note how the total pay to covered service provider / recordkeeper Fidelity trended:



Exhibit 16

116.    In other words, as the number of records Fidelity had to maintain decreased, its compensation dramatically increased, and despite technological advances continually making recordkeeping less costly.  The compensation to Fidelity was excessive, more so as time moved on and Fidelity's costs dropped, but its compensation increased.

### 4. **The Defendants allowed excessive sub-transfer agency fees and revenue sharing**

117. There were several ways the CSPs were overpaid. First, the Plan allowed excessive sub-transfer agency fees and revenue sharing.

118. Defendants chose funds that largely engaged in revenue sharing and had embedded fees including sub-transfer agency fees that cost the trust, and thus the participants, much money.

119. SEC Rule 12b-1 fees are characterized as marketing fees. These fees for example increase by at least $2,500 (and even $6,000/yr or more) for each $1M in contributions/dividends/interest. But for the Defendants' use of many revenue sharing classes of funds, growth of plan/trust assets either from the workers' biweekly savings, their matching dollars, their dividends received, their interest received or their realized gains received, etc., the 12b-1/sub-transfer agency fees are embedded and increase commensurately (and thus the covered service providers (CSP) compensation also increases).

120. Unchecked, based on the Plan's average 16% growth per annum, covered service providers' (CSP) pay will double every 54 months, even though the cost to run the Plan does not increase in lockstep or even close.

121. The Defendants' burden to manage the "menu" of offerings to participants/beneficiaries is increased (over less expensive non-passive and passive offerings) by the types of mutual funds they selected and retained for participants/beneficiaries to defer their salaries into every other week. Non-revenue sharing "managed" or active funds place only three cost burdens on workers' 401k investments—SEC filing fees, manager's fees and the manager's trading costs. However, the revenue sharing versions chosen by the Defendants have "asset-based" expenses called (1) SEC Rule 12b-1 costs; (2) "sub-transfer agency" fees (desired by Wells Fargo/Fidelity for

recordkeeping so that they make more money as participants/beneficiaries save more money); (3) finder's fees; (4) shareholder fees; etc.

122.     **A January 12, 2021 article called,** "Surprise! Mutual fund revenue sharing makes 401(k)s more expensive" is instructive. It concludes that, "Revenue sharing fees ultimately make retirement plans more expensive, and funds that include them are disproportionately favored on plan menus, a recent academic paper found".4 [Emphasis added].  The article built on work entitled "Mutual Fund Revenue Sharing in 401(k) Plans," by Veronika Pool, Clemens Sialm and Irina Stefanescu. Pool is a professor of finance at Vanderbilt University, Sialm is a professor of finance at the University of Texas at Austin and Stefanescu is a principal economist at the Board of Governors of the Federal Reserve System.  Notable quotes include:

> A.   "Plan *record keepers have a financial incentive to have revenue-sharing mutual funds on plan menus*, particularly when they are *compensated beyond the cost of administering a plan*."
>
> B.   "If direct and indirect payments do not offset each other, *record keepers may collect more revenue in the presence of indirect compensation, and participants may pay higher fees in these plans*," the authors wrote. "Additionally, if record keepers are better off when they receive compensation indirectly, they may influence 401(k) sponsors to include and subsequently keep funds on the menu that pay a *higher rebate, even when these funds are dominated by peer options*."
>
>> a.   "The researchers used 401(k) data from the Department of Labor from 2009 to 2013 for the 1,000 largest plans in the country. Fifty-four percent of plans during that time included funds that paid revenue sharing to record keepers,

---

4 https://www.investmentnews.com/revenue-sharing-401k-fees-increase-plan-cost-201155

and 55% of third-party funds that include revenue-sharing fees offered revenue-sharing rebates to record keepers, according to the paper. Such funds were 60% more likely to be added to plan menus than those that did not provide revenue sharing to record keepers, the authors found. The funds were also significantly less likely to be removed from plan menus."

*b.* "Overall, our results suggest that revenue sharing affects the investment choices offered to plan participants," they wrote. *The higher costs associated with those funds did not completely offset record-keeping expenses, meaning that they were correlated to higher total plan cost. Further, the funds' investment performance did not make up for the difference, the authors found."*

c. "But not all funds that include revenue-sharing fees rebate them to record keepers, and plan menus often include a mix of funds that do and do not have such practices, the paper noted. Because of that, *administrative costs can be disproportionately shouldered by participants who invest in one fund versus another, the authors stated."*

C. "High revenue-sharing funds are favored by plans: they are more likely to be added as an investment option and are also more likely to be retained," they wrote. "Our results are consistent with the notion that these less transparent indirect payments allow recordkeepers to extract additional rents from plan participants."

126. The Plan had embedded in it these various fees that kicked back to CSP. These fees burden the Plan's participants and inured to the benefit of Advanced Auto by releasing pressure on the

CSPs to charge the employer fees for recordkeeping, etc. The result was excessive compensation to the CSPs that should be refunded to the Plan.

### 5. The Plan's funds bizarrely resulted in some participants paying highly disproportionate costs

127.     The Plan contained funds that disproportionately paid expenses to the Plan's CSPs, resulting in some members paying more than others for the same service, and to discern the differences would be difficult for any participant.

128.     For example, Defendants selected/retained the funds "T. Rowe Price Blue Chip Growth" and "Carillon Scout Mid Cap" pay the covered service providers (CSP) zero compensation—ever. However, the 2009 to 2019 compensation in the chart below (derived from the Defendants' certified filings and the prospectuses filed by the funds at the U.S. Securities and Exchange Commission (SEC)) varies both *per fund* (*Pimco v. Brown*) and per year (*as in sub-ta for Brown increasing from 0.10% to 0.40%, a fourfold increase*).



Exhibit 17

129.    So, for example, the Plan's average account balance in 2015 was $22,000. If one worker bought the Brown Capital Mgmt Small Co she would pay $132 in recordkeeping costs. If another worker bought the Defendants' Carillon Scout Mid Cap her recordkeeping fees would be zero dollars. This violates the Defendants' own plan documents non-discriminatory "benefits, rights and features" clause as well as ERISA's sole and exclusive rule.

### 6. The Defendants allowed the CSPs and recordkeepers to charge asset-based compensation which over time resulted in predictable and inevitable overcharging for services

130.    As was discussed in the definitions, asset-based compensation means a provider is paid a percentage of assets in a Plan.

131.    Asset-based compensation is inherently fraught with the possibility of paying CSPs disproportionate fees.  Take a simple example.  If the Plan's investments have a great year and rises 20%, and a Plan has no incoming or departing members, a recordkeeper's compensation would rise 20% for the exact same work.  Obviously, costs would not have risen 20%, and thus the recordkeeper at the end of the year would be overpaid as compared to the year before.

132.    Because recordkeepers' labor and declining technology/cloud costs are tied to the number of participants/beneficiaries' "records" kept, not their assets, "asset-based pay" can be excessive and almost always imprudent in ERISA and when used by 401k Plan and Trusts.

133.    This asset-based compensation largely explains the data shown above whereby CSPs fees increased as the Plan's assets grew with no lockstep increase in the CSP's costs, creating overpayments to the CSP that were inevitable given the compensation scheme the Defendants chose for the Plan.

## **7. The Defendants predominantly chose more expensive actively managed funds**

134.    The Defendants mainly chose actively managed funds.   These funds are much more expensive than passive or index funds, and their performance does not typically justify the costs.

135.    *"The greater the trustee's departure from one of the valid passive strategies, the greater is likely to be the burden of justification [for selecting an active investment strategy] and also of continuous monitoring [of it]."* Reporter's General Note on Section 227 of the Restatement 3rd of Trusts (Prudent Investor Rule), comments e through h, page 79.

136.    The Defendants increased their investment selection and monitoring burdens by primarily using non-passive funds since records were first filed for the 2009 plan year. Non-passive funds have several heavy annual fee burdens not found in passive funds. The first is the manager who is paid to pick stocks and bonds. The second largest known cost is the revenue sharing or SEC Rule 12b-1 and/or "sub-transfer agency" fees. These costs taken daily from participants/beneficiaries do not include the manager's "trading" or "transactions costs" for buying and selling funds. The U.S. Securities and Exchange Commission (SEC) puts this at 0.93% to 1.75% annually.

| | Commissions | Spread Costs | Market Impact/ Opportunity Costs | Total |
|---|---|---|---|---|
| **SEC**[vi] | 0.30% | 0.45% | 0.18-1% | 0.93-1.75% |

Exhibit 18

137.    Using 2015 as an example, which was the first year Fidelity served as the Plan's recordkeeper, the Plan's funds averaged (1) thirty-four basis points (0.34%) in annual revenue sharing and other fees and (2) sixty basis points (0.6%) in annual manager fees.  By contrast, passive funds average fifteen basis points (0.15%) in fees.  Thus, the non-passive funds' total annual costs (versus ninety-four (0.94%)) equates to a six-fold burden increase for the Defendants.

Again, these numbers do NOT include trading costs—these additional costs are found only by comparing the returns of the Defendants' funds versus their benchmarks.



Exhibit 19

138.     Thus, the Plan had about six times the costs it could have, and it did not generally offer comparable, less expensive passive funds to the participants.   Thus, the participants were effectively locked into paying about 93 basis points a year for management of funds that could have been predominantly saved in their accounts and then compounded annually for the retirement.

### 8. Technological advances, scale, and the Plan's age and maturity meant that CSP and recordkeeping cost should have trended down, not up

139.     All of this discussion must be underscored by the reality that recordkeeping costs have trended down as technology makes recordkeeping less expensive.

### B.  THE DEFENDANTS DID NOT DIVERSIFY THE PLAN

140.     The Defendants did not diversify the Plan adequately, the Plan resultantly being too heavy on choices that were so correlated with each other than participants could not hedge risk or capture gains in areas of the economy beyond equities.

141.    The investment policies by Fidelity®, Vanguard, T. Rowe Price, follow the same criteria as Fiduciary Analytics' "Sample IPS" (www.fi360.com) which states:

a.  "Thus, the well-diversified investment options the Plan will offer include choices among the three primary asset classes (cash, bonds, and stocks). Within stocks, there should be additional opportunities to diversify by style. In addition, it is intended that the Plan will offer a variety of investment options (funds) that allow employees to construct an investment portfolio across a broad risk/return spectrum to achieve their own investment goals based on the following: Each fund should be an appropriate building block to forming a reasoned and diversified portfolio; Each fund should be relatively low-cost and broadly diversified within its area of focus; Each fund should capture asset-class returns (i.e., be fully invested and diversified in its area of focus)."

b.  "In selecting the investments, the Committee intends to offer an investment line-up that is understandable to participants as well as adequately diversified across assets classes, covering a broad range of risk and return characteristics.  The Committee will consider investment options to enable participants to meet their individual savings goals. Criteria for evaluating an investment line-up: The ability to construct a diversified portfolio with the Plan's investment offerings."

142.    Although equities provide potential for higher upside than lower-risk investments like bonds, they also expose the plan to the potential for greater losses. Moreover, diversifying investments is important to reduce risk and uncertainty because different asset classes generally do not increase or decrease in value at the same time. Indeed, diversification is so fundamental an investment concept and so critical to protecting plan assets that Congress explicitly included it as part of a fiduciary's duties. 29 U.S.C. 1104(a)(1)(C).

143.    Looking at the risk relative to other funds (below image) selected and retained by the Defendants, we find the median number of holdings is only 83 stocks. This lack of diversification creates massive volatility for the participants/beneficiaries that own these funds picked for them by the Defendants. Most of the Defendants funds' prospectus benchmarks are Russell 1000, Russell 2000, Russell 3000, S&P 500, S&P 600 and S&P 400 (stocks respectively numbering: 1,000, 2,000, 3,000, 500, 600 and 400). The Defendants' violated 29 U.S. Code Section 1104(a)(1)(C) by failing to adequately diversify the investments of the plan so as to minimize the risk of large losses.

| | Expense Ratio | Annualized Std.Deviation 1-year | Number of Holdings | Name |
|---|---|---|---|---|
| 1 | 1.080 | 11.38 | 154 | Loomis Sayles Small Cap Value Instl |
| 2 | 0.740 | 12.94 | 104 | Harbor International Institutional |
| 3 | 1.070 | 11.35 | 98 | Scout Mid Cap |
| 4 | 0.990 | 13.35 | 94 | Thornburg International Value R5 |
| 5 | 1.200 | 13.52 | 83 | Artisan International Investor |
| 6 | 0.540 | 16.17 | 64 | Janus Overseas I |
| 7 | 0.820 | 11.02 | 55 | CRM Mid Cap Value Instl |
| 8 | 1.050 | 10.23 | 50 | Diamond Hill Large Cap A |
| 9 | 1.280 | 13.27 | 40 | Brown Capital Mgmt Small Co Inv |

Exhibit 20

144.    Looking back to the Defendants' first publicly-available Form 5500 submission at www.efast.dol.gov for the 2009 Plan Year, the Plan's equity funds were ~90% correlated with one another. This means that during a typical thirty percent (30%) equity loss period (requiring a subsequent forty-three percent (43%) gain to reach "break-even") that a participants/beneficiaries' typical four fund holdings, three equity and one bond/stable value (typically "equally deferred or saved into" by participants/beneficiaries), will experience a 30% loss for three (75%) of their four holdings (.75*(30%)=22.5%) or a twenty-two and one-half percent decline in the account value.

145.    Plaintiffs' experts have analyzed the Plan's equity funds, which are the assets typically owned by a younger workforce in 401k plans, listed in the Defendants' Forms 5500 for three (3) distinct periods to assess overall correlation or lack thereof. First, they analyzed the mutual funds contained on 12/31/2010 and stated in the Defendants' 2010 Form 5500 filing. Second, they analyzed correlations for the Defendants' selected/retained mutual funds as of 12/31/2014 or 1/1/2015 (effectively) from the Defendants' Form 2014 5500 filings. Third, they analyzed correlations for the Defendants' selected/retained mutual funds as of 12/31/2018 and stated in the Defendants' Form 2018 5500 filing—that was the last complete Form 5500 filed by the Defendants.

146.    In each period, over 89% of the Plan and Trust's total assets rested in these highly correlated equity funds. According to the duty of diversification, ERISA plan trustees should not normally invest all or an unduly large portion of plan funds in a single security, or in any one type of security, or even in various types of securities that depend on success of one enterprise. Employee Retirement Income Security Act of 1974, § 404(a)(1)(C), 29 U.S.C.A. § 1104(a)(1)(C).

147.    For example, for the plan year ending 12/31/2009, the Defendants' first electronic Annual Return/Report of Employee Benefit Plan, the investments, selected/retained by the Defendants at the time of their government certified filing, were 87.6% correlated.

| Correlation Results | 87.6% | | | | | | |
|---|---|---|---|---|---|---|---|
| Asset correlations for time period 09/01/2002 - 12/31/2009 based on monthly returns. | | | | | | | |
| Name | Ticker | ARTIX | BCSIX | CRIMX | KDHIX | LSSCX | OAKBX |
| Artisan International Investor | ARTIX | 1 | 0.78 | 0.87 | 0.87 | 0.84 | 0.86 |
| Brown Capital Mgmt Small Co Inv | BCSIX | 0.78 | 1 | 0.85 | 0.74 | 0.89 | 0.79 |
| CRM Mid Cap Value Instl | CRIMX | 0.87 | 0.85 | 1 | 0.89 | 0.94 | 0.87 |
| DWS CROCI Equity Dividend Inst | KDHIX | 0.87 | 0.74 | 0.89 | 1 | 0.86 | 0.88 |
| Loomis Sayles Small Cap Value Instl | LSSCX | 0.84 | 0.89 | 0.94 | 0.86 | 1 | 0.84 |
| Oakmark Equity And Income Investor | OAKBX | 0.86 | 0.79 | 0.87 | 0.88 | 0.84 | 1 |

Exhibit 21

148.    The Defendants' chosen/retained funds reported to the IRS/DOL for the second period's analysis (*ending in the first year of the limitations period; 12/31/2015*) were correlated to the tune of 92.4%:

| Correlation Results | 92.4% | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Asset correlations for time period 06/01/2011 - 12/31/2015 based on monthly returns. | | | | | | | | | | | | | | | | |
| Name | Ticker | ARTIX | BCSIX | DHLAX | LIBIX | LIHIX | LIJIX | LIKIX | LINIX | LIPIX | LIVIX | LSSCX | NEIAX | UMBMX | VEXAX | VTIAX |
| Artisan International Investor | ARTIX | 1 | 0.76 | 0.85 | 0.96 | 0.96 | 0.96 | 0.96 | 0.96 | 0.96 | 0.96 | 0.84 | 0.9 | 0.87 | 0.89 | 0.94 |
| Brown Capital Mgmt Small Co Inv | BCSIX | 0.76 | 1 | 0.83 | 0.79 | 0.8 | 0.8 | 0.8 | 0.79 | 0.81 | 0.81 | 0.9 | 0.81 | 0.84 | 0.91 | 0.72 |
| Diamond Hill Large Cap Inv | DHLAX | 0.85 | 0.83 | 1 | 0.9 | 0.92 | 0.92 | 0.92 | 0.92 | 0.92 | 0.92 | 0.91 | 0.97 | 0.91 | 0.92 | 0.82 |
| BlackRock LifePath Index 2025 Instl | LIBIX | 0.96 | 0.79 | 0.9 | 1 | 0.99 | 1 | 1 | 1 | 0.99 | 0.99 | 0.88 | 0.95 | 0.89 | 0.92 | 0.95 |
| BlackRock LifePath Index 2045 Instl | LIHIX | 0.96 | 0.8 | 0.92 | 0.99 | 1 | 1 | 1 | 1 | 1 | 1 | 0.89 | 0.96 | 0.91 | 0.92 | 0.95 |
| BlackRock LifePath Index 2035 Instl | LIJIX | 0.96 | 0.8 | 0.92 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 0.88 | 0.96 | 0.9 | 0.92 | 0.95 |
| BlackRock LifePath Index 2040 Instl | LIKIX | 0.96 | 0.8 | 0.92 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 0.89 | 0.96 | 0.9 | 0.92 | 0.95 |
| BlackRock LifePath Index 2030 Instl | LINIX | 0.96 | 0.79 | 0.91 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 0.88 | 0.96 | 0.9 | 0.92 | 0.95 |
| BlackRock LifePath Index 2050 Instl | LIPIX | 0.96 | 0.81 | 0.92 | 0.99 | 1 | 1 | 1 | 1 | 1 | 1 | 0.89 | 0.96 | 0.91 | 0.93 | 0.95 |
| BlackRock LifePath Index 2055 Instl | LIVIX | 0.96 | 0.81 | 0.92 | 0.99 | 1 | 1 | 1 | 1 | 1 | 1 | 0.89 | 0.96 | 0.91 | 0.93 | 0.95 |
| Loomis Sayles Small Cap Value Instl | LSSCX | 0.84 | 0.9 | 0.91 | 0.88 | 0.89 | 0.88 | 0.89 | 0.88 | 0.89 | 0.89 | 1 | 0.89 | 0.88 | 0.97 | 0.8 |
| Columbia Large Cap Index A | NEIAX | 0.9 | 0.81 | 0.97 | 0.95 | 0.96 | 0.96 | 0.96 | 0.96 | 0.96 | 0.96 | 0.89 | 1 | 0.91 | 0.92 | 0.86 |
| Carillon Scout Mid Cap I | UMBMX | 0.87 | 0.84 | 0.91 | 0.89 | 0.91 | 0.9 | 0.9 | 0.9 | 0.91 | 0.91 | 0.88 | 0.91 | 1 | 0.95 | 0.84 |
| Vanguard Extended Market Index | VEXAX | 0.89 | 0.91 | 0.92 | 0.92 | 0.92 | 0.92 | 0.92 | 0.92 | 0.93 | 0.93 | 0.97 | 0.92 | 0.95 | 1 | 0.84 |
| Vanguard Total Intl Stock Index Admiral | VTIAX | 0.94 | 0.72 | 0.82 | 0.95 | 0.95 | 0.95 | 0.95 | 0.95 | 0.95 | 0.95 | 0.8 | 0.86 | 0.84 | 0.84 | 1 |
| Notes on results: | | | | | | | | | | | | | | | | |

Exhibit 22

149.    Similarly, funds from the most recent of the Defendants' DOL/IRS filings shows a 91.6% correlation:

| Correlation Results | 91.6% | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Asset correlations for time period 07/01/2016 - 05/31/2021 based on monthly returns. | | | | | | | | | | | | | | | | |
| Name | Ticker | BCSIX | DHLAX | FSMAX | FTIHX | FXAIX | LIHIX | LIJIX | LIKIX | LINIX | LIPIX | LIVIX | LIZIX | LSSCX | RERGX | TBCIX | UMBMX |
| Brown Capital Mgmt Small Co Inv | BCSIX | 1 | 0.7 | 0.84 | 0.64 | 0.78 | 0.75 | 0.76 | 0.76 | 0.77 | 0.75 | 0.75 | 0.75 | 0.72 | 0.69 | 0.82 | 0.84 |
| Diamond Hill Large Cap Inv | DHLAX | 0.7 | 1 | 0.92 | 0.87 | 0.97 | 0.95 | 0.95 | 0.95 | 0.94 | 0.95 | 0.95 | 0.95 | 0.93 | 0.85 | 0.83 | 0.93 |
| Fidelity Extended Market Index | FSMAX | 0.84 | 0.92 | 1 | 0.86 | 0.92 | 0.94 | 0.94 | 0.94 | 0.94 | 0.94 | 0.94 | 0.94 | 0.95 | 0.86 | 0.84 | 0.97 |
| Fidelity Total International Index | FTIHX | 0.64 | 0.87 | 0.86 | 1 | 0.88 | 0.95 | 0.95 | 0.95 | 0.95 | 0.95 | 0.95 | 0.95 | 0.81 | 0.98 | 0.81 | 0.86 |
| Fidelity 500 Index | FXAIX | 0.78 | 0.97 | 0.93 | 0.88 | 1 | 0.97 | 0.97 | 0.97 | 0.97 | 0.97 | 0.97 | 0.97 | 0.88 | 0.87 | 0.92 | 0.94 |
| BlackRock LifePath Index 2045 Instl | LIHIX | 0.75 | 0.95 | 0.94 | 0.95 | 0.97 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 0.89 | 0.94 | 0.89 | 0.94 |
| BlackRock LifePath Index 2035 Instl | LIJIX | 0.76 | 0.95 | 0.94 | 0.95 | 0.97 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 0.88 | 0.94 | 0.89 | 0.94 |
| BlackRock LifePath Index 2040 Instl | LIKIX | 0.76 | 0.95 | 0.94 | 0.95 | 0.97 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 0.89 | 0.94 | 0.89 | 0.94 |
| BlackRock LifePath Index 2030 Instl | LINIX | 0.77 | 0.94 | 0.94 | 0.95 | 0.97 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 0.87 | 0.94 | 0.9 | 0.93 |
| BlackRock LifePath Index 2050 Instl | LIPIX | 0.75 | 0.95 | 0.94 | 0.95 | 0.97 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 0.89 | 0.94 | 0.89 | 0.94 |
| BlackRock LifePath Index 2055 Instl | LIVIX | 0.75 | 0.95 | 0.94 | 0.95 | 0.97 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 0.89 | 0.94 | 0.89 | 0.94 |
| BlackRock LifePath Index 2060 Instl | LIZIX | 0.75 | 0.95 | 0.94 | 0.95 | 0.97 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 0.89 | 0.94 | 0.89 | 0.94 |
| Loomis Sayles Small Cap Value Instl | LSSCX | 0.72 | 0.93 | 0.95 | 0.81 | 0.88 | 0.89 | 0.88 | 0.89 | 0.87 | 0.89 | 0.89 | 0.89 | 1 | 0.78 | 0.73 | 0.94 |
| American Funds Europacific Growth R6 | RERGX | 0.69 | 0.85 | 0.86 | 0.98 | 0.87 | 0.94 | 0.94 | 0.94 | 0.94 | 0.94 | 0.94 | 0.94 | 0.78 | 1 | 0.85 | 0.86 |
| T. Rowe Price Blue Chip Growth I | TBCIX | 0.82 | 0.83 | 0.84 | 0.81 | 0.92 | 0.89 | 0.9 | 0.89 | 0.9 | 0.89 | 0.89 | 0.89 | 0.73 | 0.85 | 1 | 0.85 |
| Carillon Scout Mid Cap I | UMBMX | 0.84 | 0.93 | 0.97 | 0.86 | 0.94 | 0.94 | 0.94 | 0.94 | 0.93 | 0.94 | 0.94 | 0.94 | 0.94 | 0.86 | 0.85 | 1 |

Exhibit 23

150.    The Defendants thus failed to adequately diversify the Plan, exposing the participants to unnecessary swings in the market instead of allowing a safer approach to building for their retirement.

## CLASS ACTION ALLEGATIONS

151.     Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the class of persons described herein and on behalf of the Plan. Plaintiffs reserve the right to revise their class definitions and to propose other or additional classes in subsequent pleadings or their motion for class certification, after discovery in this action.

152.     Plaintiffs Deniece Pagans and Janet Sweet assert the Counts against Defendants on behalf of the Plan and in acting in this representative capacity to enhance the due process protections of unnamed participants and beneficiaries of the Plan, as an alternative to direct individual actions on behalf of the Plan under 29 U.S.C. §§ 1132(a)(2) and (3), Plaintiffs seek to certify this action as a class action on behalf of all participants and beneficiaries of the Plan.

153.     Numerosity: The Classes are so numerous that joinder of all Class members is impracticable. The Plan had at times over 70,000 participants and beneficiaries at the start of the applicable statutory period.

154.     Typicality: Plaintiffs' claims are typical of the Class members' claims. Like other Class members, Plaintiffs are current or former participants in the Plan, who have suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiffs consistently with other class members with regard to the Plan. Defendants managed the Plan as a single-employer defined contribution plan, in an omnibus account, and therefore Defendants' imprudent decisions affected all Plan participants similarly. Plan participants are trust beneficiaries of the same Trust and use the same custodian and recordkeeping system.

155.     The Plan is subject to the provisions of Employee Retirement Income Security Act of 1974 ("ERISA").

156.    The mutual funds and other securities at issue are not registered to or owned by Plan participants, like in an individual retirement account (IRA). Instead, the Plan's Trust owns the SEC-registered securities and the Trust buys and sells them at an omnibus or net aggregate trust level and settles the shares every evening with the recordkeeper (who updates an accounting record for each Plan participant every evening called a daily valuation).

157.    Therefore, each Plan participant or Class member is simply a member of the Trust or a beneficiary trading via a common trust and a common recordkeeping firm to maintain their accounts. Plaintiff's claims are typical of the claims of the Class. They have no interests that are antagonistic to the claims of the Class. Questions of law and fact are common to the members of the Class and predominate over individual questions. Plaintiffs understand that this matter cannot be settled without the Court's approval.

158.    Adequacy: Plaintiffs will fairly and adequately protect the interests of the Classes, as their interests are aligned with the Class' interest in that they seek to represent and have retained counsel experienced in class action litigation and possess good knowledge of ERISA. Plaintiffs do not have any conflicts of interest with any Class members that would impair or impede their ability to represent such Class members.

159.    Fitzgerald Litigation, P.C. ("Fitzgerald Litigation") agrees to advance the costs of this action contingent upon the outcome, and it is aware that no fee can be awarded without the Court's approval.

160.    Commonality: Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members, including but not limited to:

A.  Whether Defendants breached their duties of prudence and loyalty by maintaining a plan with excessively expensive funds when superior alternatives existed;

B.  Whether Defendants breached their duties of prudence and loyalty by failing to remove imprudent investments;

C.  Whether Defendants breached their duties of prudence and loyalty by failing to properly monitor CSPs, allowing them to overcharge the Plan with fees;

D.  Whether Defendants breached their duty to diversify Plan offerings, a separate basis of liability under 29 U.S.C. § 1104 (a)(1)(C);

E.  Whether the indirect compensation and/or revenue sharing payments received by Defendants, or any CSP, exceeded reasonable compensation for the services provided, thus constituting a prohibited transaction with a fiduciary and party-in-interest under 29 U.S.C. §1106, or whether expenses paid by Plan participants exceeded that which was reasonable and thus constituted the same under 29 U.S.C. § 1106;

F.  Whether Defendants breached their duties of loyalty and prudence by failing to follow the provisions of the Plan documents;

G.  Whether Defendants failed to exercise appropriate skill, care, loyalty, and diligence by failing to investigate lower cost funds or attempt to negotiate lower fees;

H.  Whether Defendants breached their duty to properly select Plan investments and remove imprudent investments;

I.  The proper measure of monetary relief; and

J.  The proper form of equitable and injunctive relief.

161.  Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) because prosecuting separate actions against Defendants would create a risk of inconsistent or varying adjudications

with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class. Separate lawsuits would establish incompatible standards to govern Defendants' conduct as fiduciaries.

162.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1)(B) because adjudications with respect to individual class members, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Any award or equitable relief by the Court such as removal of particular Plan investments or removal of a Plan fiduciary would be dispositive of non-party participants' interests. The accounting and restoration of the property of the Plan that would be required under 29 U.S.C. §§ 1109 and 1132 would be similarly dispositive of the interests of other Plan participants.

163.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Classes predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants' conduct described in this Complaint applied uniformly to all members of the Classes.

164.    Class members do not have an interest in pursuing separate actions against Defendants, as the amount of each Class members individual claims is relatively small compared to the expense and burden of individual prosecution, and Plaintiffs are unaware of any similar claims brought against Defendants by any Class members on an individual basis.

165.    Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' practices.

166.    Moreover, management of this action as a class action will not present any likely difficulties.

167.    In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

## COUNT I

**BREACH OF DUTIES OF LOYALTY AND PRUDENCE, 29 U.S.C. § 1104(a)(1)(A)-(B), BY SELECTING AND FAILING TO REMOVE EXPENSIVE IMPRUDENT FUNDS AND BY FAILING TO MONITOR CSP'S RESULTING IN OVERCOMPENSATION.**

168.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

169.    29 U.S.C. § 1104 imposes the fiduciary duties of prudence and loyalty upon Defendants in their administration of the Plan and in their selection and monitoring of Plan investments.

170.    During the Class period, the Defendants were named fiduciaries pursuant to 29 U.S.C. § 1102(a)(1), or de facto fiduciaries within the meaning of 29 U.S.C. § 1002(21)(A), or both.

171.    Defendants breached their duties of loyalty and prudence by:

A.  Providing expensive share classes rather than otherwise identical but less expensive share classes;

B.  Maintaining share classes with excessive, costly fees and failing to remove them once this was uncovered;

C.  Allowing CSPs to charge excessive fees to participants and the Plan;

D.  Not negotiating with CSPs to lower costs; and

E.  The breaches and issues described more fully in the motion above for class certification.

172.    Based on Forms 5500 from the years at issue, most, if not all, of the Plan's investments failed because the Defendants' investment decision methods and procedures were flawed.

173.    As described throughout the Complaint, Defendants breached their fiduciary duties of prudence and loyalty related to administration of the Plan by failing to take reasonable steps to manage administrative costs and fees, including selecting funds that charged those fees to Plan participants and not on Defendants.

174.    Defendants have not engaged in an objective, competitive process to hire the lowest cost provider for these services. Instead, they have been changing the compensation paid to these companies by increasing compensation disproportionally for no discernable reason.

175.    The compensation to CSPs has been arbitrarily rising year after year in the same way, constituting another breach on Defendants' part.

176.    Much of this high compensation was asset-based and came from heavy fees levied on the Plan participants assets and the assets of the Plan/Trust itself. Choosing almost exclusively funds with fee structures similar to this is an imprudent decision negatively affecting the Plan participants, for which they should be compensated.

177.    Defendants also failed to take prudent steps to monitor and control administrative costs on an ongoing basis, such as hiring a consultant to conduct a benchmarking study, submitting an RFP (or RFI) to other service providers to solicit information and competitive bids, and hiring those CSP's with the most competitive pricing and services.

178.    According to Labor Department rules, their failure to adequately monitor the performance and cost of all CSPs constitutes a neglect of their responsibilities as a fiduciary and violates the fiduciary responsibility and prudence standards required by ERISA.

179.    Defendants breached their fiduciary duties of prudence and loyalty with respect to selection and management of the Plan's investment options by, inter alia:

A.  Failing to act "solely and exclusively" for the benefit of participants by selecting and retaining investments in the Plan NOT because they merited inclusion after a thorough investigation, but because they would generate more revenue for the CSPs, and therefore Defendants would not receive an invoice (or a significantly reduced one) for these services;

B.  Selecting and maintaining mutual funds in the Plan based upon their willingness to pay revenue sharing and/or indirect compensation rather than selecting identical lower-cost versions that may not have been willing to pay revenue sharing, but would increase compounded growth of participants' accounts;

C.  Negotiating large revenue sharing payments in lieu of attempting to negotiate lower investment management expenses or refunding larger portions of investment management expenses to Plan participants;

D.  Failing to monitor Plan investments and explore whether the mutual fund investment management services could be provided at lower cost, despite the fact that lower cost funds' assets were orders of magnitude larger;

E.  Failing to conduct a prudent and objective review of the Plan's investments and failing to remove the imprudent, costly, and underperforming funds;

F.  Allowing earnings from mutual funds to be automatically reinvested in the same imprudent funds that generated them, diluting Plan participants current and future growth potential; and

      G. Failing to conduct a prudent and objective review of the Plan's investments' correlations to one another and protect investors from account losses.

180. According to Plan documents, the Plan administrator determines which expenses will be charged to the Plan as a whole and which will be charged against individual accounts, and to manage and control the operations and administration of the Plan, which may be designated out to other individuals or organizations. Once Plaintiffs obtain the Plan's Adoption Agreement, meeting minutes, etc., a more formal and precise list of Defendants and breaches can be asserted. As described throughout the Complaint, Defendants breached their fiduciary duties of prudence and loyalty related to administration of the Plan by failing to take reasonable steps to manage administrative costs of the Plan.

181. Defendants hired CSPs to further the Defendants' profits without engaging in an objective, competitive process to hire unconflicted and reasonably compensated providers that were necessary for the operation of the Plan.

182. Each Defendant performing non-investment-related duties also knowingly participated in the breaches of the other Defendants performing such duties, knowing that other Defendants were breaching their fiduciary duties, and enabling commission of the breaches by failing to lawfully discharge their own fiduciary duties or make any reasonable effort under the circumstances to remedy the other Defendants' breaches.

183. Each Defendant is personally liable, and Defendants are jointly and severally liable, under 29 U.S.C. §§ 1109(a), 1132(a)(2), and (a)(3), to make good to the Plan the losses resulting from the aforementioned breaches, to restore to the Plan any profits Defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count.

184.     On behalf of the Plan, Plaintiffs also seek appropriate equitable relief pursuant to 29 U.S.C

§ 1132(a)(3) (as described in the Prayer for Relief), recovery of pre-judgment interest, *see*

*Quesinberry v. Life Ins. Co. of N. Am.,* 987 F.2d 1017, 1030-31 (4th Cir. 1993); *Meyer v. Berkshire*

*Life Ins. Co.,* 250 F. Supp. 2d 544, 574 (D. Md. 2003), and attorney fees and costs pursuant to 29

U.S.C. § 1132(g).

## COUNT II

### BREACH OF DUTY TO DIVERSIFY THE INVESTMENTS OF THE PLAN UNDER 29 U.S.C. § 1104(a)(1)(C).

185.     Plaintiffs reallege and incorporate by reference the proceeding paragraphs as if set forth

herein.

186.     Defendants were fiduciaries, as discussed above, for the Plan and their participants,

including Plaintiffs and the proposed Class.

187.     A fiduciary must comply with the duty of prudence, which includes, *inter alia*, the duty to

diversify and to monitor and remove improper investments. In carrying out these duties, fiduciaries

must comply with the care, skill, prudence, and diligence of a prudent person under the

circumstances then prevailing.

188.     The U.S. Department of Labor and case law have interpreted this duty. In order to comply

with the duty of prudence, a fiduciary must give "appropriate consideration to those facts and

circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or

should know are relevant to the particular investment or investment course of action involved,

including the role that the investment or investment course of action plays in that portion of the

plan's investment portfolio with respect to which the fiduciary has investment duties." 29 C.F.R.

§ 2550.404a-1(b)(1).

189.    Appropriate consideration, according to Department of Labor regulations, includes but is not necessarily limited to: "(i) [a] determination by the fiduciary that the particular investment or investment course of action is reasonably designed, as part of the portfolio (or whether applicable, that portion of the plan portfolio with respect to which the fiduciary has investment duties), to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action; and (ii) [c]onsideration of the following factors …:

    A.   [t]he composition of the portfolio with regard to diversification,

    B.   [t]he liquidity and current return of the portfolio relative to the anticipated cash flow requirements of the plan; and

    C.   [t]he projected return of the portfolio relative to the funding objectives of the plan." 29 C.F.R. § 2550.404a-1(b)(2).

190.    Defendants' conduct with respect to the Plan violated in numerous ways their fiduciary duties of prudence and diversification as alleged above.

191.    Defendants also maintained a portfolio with high asset correlations, meaning the contents of the portfolio were too similar to have sufficient diversification.

192.    This Count focuses primarily on the diversification deficiencies described above. The Plan is not construed in a way to allow participants to diversify their investments, and this they are unable to maintain a good portfolio.

193.    Defendants' actions directly and proximately caused substantial financial harm to Plaintiffs and the proposed Class. As a result of this wrongdoing, Defendants are liable for all resulting loss and damage.

## COUNT III

### BREACH OF DUTIES OF LOYALTY AND PRUDENCE BY FAILING TO FOLLOW THE TERMS OF THE PLAN DOCUMENT AND GOVERNING INSTRUMENTS UNDER 29 U.S.C. § 1104(a)(1)(D).

194.    Plaintiffs reallege and incorporate by reference the allegations in the preceding paragraphs.

195.    29 U.S.C. § 1104 imposes the fiduciary duties of prudence and loyalty upon Defendants in adhering to the written provisions of the documents and instruments governing the plan, insofar as those instruments are otherwise in accordance with ERISA.

196.    A plan may be disqualified from favorable tax treatment for operational failures, which occur if a plan fails to operate in accordance with statutory requirements, or if it fails to follow the terms of the plan document. 26 U.S.C. §§ 401 (a), 501(a).

197.    Defendants failed to take any corrective action in response to imprudent funds that had been contained in the Plan portfolio. Such corrective action is required by the Plan document. This would have been easy for Defendants to do under correction programs offered by both the IRS and the Department of Labor.

198.    Defendants failed to allocate Plan administrative expenses in a reasonable, uniform, and non-discriminatory way, which violated the Plan document.

199.    Along the same vein, Defendants failed to adopt or follow an expense policy, the absence of which undoubtedly resulted in the overly excessive fees and other charges imposed on Plan participants by Defendants and CSPs.

200.    Had Defendants adhered to their governing plan documents as ERISA requires, many of the breaches detailed previously in this Complaint may not have occurred, or the consequences of them may have been lessened. Defendants chose not to follow the document's provisions, in violation of their fiduciary duties.

201.    Once Plaintiffs obtain the official Plan document, a more formal and precise list of Defendants' violations of the document can be asserted.

202.    Repeated failure to follow the guidelines of the plan document compounded the already-existing issues surrounding Plan administration and investment decision described in this Complaint, allowing them to proceed to even worse degrees.

203.    Defendants' actions directly and proximately caused substantial harm to Plaintiffs and the proposed Class, and as a result, Defendants are liable for all resulting loss and financial damages. Plaintiffs seek remedies available to them under these circumstances, including reimbursement for all losses, injunctive relief, and removal of the Plan's managers.

## PRAYER FOR RELIEF

For these reasons, Plaintiffs, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully request that the Court:

1)  Find and declare that Defendants have breached their fiduciary duties as described above;

2)  Find and adjudge that Defendants are personally liable to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duties or prohibited transaction, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duties;

3)  Determine the method by which plan losses and fiduciary profits should be calculated, and order Defendants to provide all accountings necessary to determine the amounts Defendants must make good to the Plan under 29 U.S.C. § 1109(a);

4)  Find and adjudge that Defendants must disgorge all sums of money received from their use of assets of the Plan;

5) Impose a constructive trust on any monies by which Defendants were unjustly enriched as a result of breaches of fiduciary duty or prohibited transactions, and cause Defendants to disgorge such monies and return them to the Plan;

6) Remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;

7) Surcharge against Defendants and in favor of the Plan all amounts involved in any transactions which an accounting reveals were improper, excessive, and/or in violation of ERISA;

8) Order equitable restitution against the Defendants;

9) Certify the Class, appoint each of the Plaintiffs as a class representative, and appoint Fitzgerald Litigation as Lead Class Counsel;

10) Award to the Plaintiffs and the Class their attorney's fees and costs under 29 U.S.C. § 1132(g)(1) and the common fund doctrine;

11) Allow a jury trial on any matter herein, if any, trial by a jury. Plaintiffs are aware that under ERISA a jury trial is, under existing law, not permitted. However, Plaintiff makes the jury demand to preserve the right to a jury should there be a change in law or amendment to the pleadings that makes a jury trial permissible in the future;

12) Order the payment of interest to the extent it is allowed by law; and

13) Grant other equitable or remedial relief as the Court deems appropriate.

Date:   10/20/2021

Respectfully submitted,

  /s/ Andrew L. Fitzgerald
ANDREW L. FITZGERALD
V.A. State Bar No. 48282
andy@fitzgeraldlitigation.com
**FITZGERALD LITIGATION**
119 Brookstown Avenue, Suite 402
Winston-Salem, NC 27101
Telephone: 336-793-4696
Fax:  336-793-4698


  /s/ Aaron B. Houchens,
AARON B. HOUCHENS, Esq
V.A. State Bar No. 80489
aaron@houchenslaw.com
AARON B. HOUCHENS, P.C.
111 E. Main Street
P.O. Box 1250
Salem, VA 24153
Telephone: 540-389-4498
Fax: 540-339-3903